UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| REBA CRABTREE, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:08-CV-149-REW |
| | ) | |
| v. | ) | |
| | ) | OPINION AND ORDER |
| MONTICELLO FLOORING & LUMBER | ) | |
| INC. and JOHNNIE CRABTREE, | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendants, through counsel, requested leave to file a dispositive motion and tendered a related motion for summary judgment. *See* DE #33 (Motion for Leave); DE #34 (Motion for Summary Judgment); DE #34-1 (Memorandum in Support). Plaintiff, through counsel, filed responses in opposition to the motion for leave and the motion for summary judgment. *See* DE #35 (Response opposing leave); DE #39 (Response opposing summary judgment).

Under the original schedule governing dispositive motions, the parties had until June 5, 2009 (then August 31, 2009) to file such motions. *See* DE # 16 (Scheduling Order); DE # 22 (Minute Entry Order modifying deadlines). On August 31, 2009, Defendants filed a dispositive motion based only on discovery violations and not on the merits. *See* DE #24 (Motion). The Court denied that motion and put the case back on schedule. Both sides, to that point, had failed to comply with certain deadlines, and the Court gave Defendants a new date, following discovery, by which to seek leave to file a later summary judgment motion. *See* DE #29 (Minute Entry Order for Final Pretrial Conference); DE #31 (new Scheduling Order).

1

Thus, the Court sought to assure that Defendants would receive adequate discovery and then have an opportunity to raise dispositive issues on a complete pretrial record. Defendants did file a motion for leave, but the motion presented no justification for the failure to make a substantive motion previously. Further, and more importantly, the dispositive motion did not discuss, rest on, or present deposition testimony, discovery responses, or other information generated during the interim discovery period. Truly, as Plaintiff posits, Defendants' motion could have been filed in the same form at any point after the filing of the case, because the motion in essence simply targets the complaint's allegations. The motion's substance actually mirrors one under Federal Rule of Civil Procedure 12(b)(6) rather than one under Rule 56. Because of the posture, the Court in its discretion DENIES the motion for leave to file the later summary judgment motion. The new deadline did not advance the record presented beyond the mere pleadings.

Alternatively, the Court does discuss the merits presented and identifies the factual and legal issues to be resolved at trial. For the reasons stated, the Court also would DENY the summary judgment motion, as now presented.

**I. Background**

This case, which alleges violations of the Americans with Disabilities Act (ADA), the Family Medical Leave Act (FMLA), and the Kentucky Civil Rights Act, arises out of Plaintiff Reba Crabtree's employment relationship with Defendant Monticello Flooring, a relationship that began in 2002 and ended August 1, 2006. Plaintiff began as an organizer for the back room and progressed through a series of jobs including (chronologically) flooring grader, tally marker for a flooring inspector, and nesting. The nesting position involved her standing at a station, "gathering small pieces of wood, stacking them into a specific sized pile, feeding the pile into a machine that bundles,

2

and lifting the bundle, carrying it, and setting it on a pile." *See* DE #28-2 (Reba Crabtree Affidavit) at 3, ¶ 36; *id.* ¶¶ 37-39 ("Each bundle weighed between forty and fifty pounds. I was not allowed to sit down at all. I did not have a fan."). By contrast, when she worked as a tally marker, Plaintiff "worked in an office with a desk and chair," allowing her to be seated all day while doing clerical work. *See id.* at 2, ¶ 17. Additionally, she had "a commercial grade fan in the summer and heat in the winter." *See id.* ¶ 18.

In December of 2002, Plaintiff was diagnosed with Remitting/Relapsing Multiple Sclerosis (MS). *See* DE #38 (Deposition Transcript) (hereinafter "Tr. 2") at 72; DE #28-1 (Response I) at 4; *id.* at 14 (defining MS as "a chronic disease of the central nervous system characterized by clearly defined episodes of acute worsening of neurologic function followed by periods of remissions"). According to Plaintiff, she and her husband (Larry Crabtree) attended seminars or classes in order to better understand the diagnosis and any resulting limitations on Plaintiff. *See* DE #28-2 (Reba Crabtree Affidavit) at 1-2, ¶¶ 10-11. Additionally, Mr. Crabtree invited some of the Monticello Flooring supervisors to attend; none accepted the invitation. *See* DE #28-3 (Larry Crabtree Affidavit) at 2, ¶¶ 15-16 ("My wife and I learned about the disease (MS) by going to classes offered about it. We invited Johnny [sic] Crabtree, Jeff Keith, and Jason Keith to attend these classes to learn about Reba's limitations, but they declined.").

As a result of Plaintiff's MS, she suffered from bladder and kidney issues, "extreme exhaustion and limited ability for standing, walking, cleaning the house, and other major life activities." *See* DE #28-1 (Response I) at 14; DE #28-2 (Reba Crabtree Affidavit) at 2, ¶¶ 20-21 (discussing bladder and kidney trouble); *id.* at 4, ¶¶ 41-42 (discussing heat-related symptoms); *id.* ¶¶ 56-57 (discussing muscle aches/pains and fatigue). According to Plaintiff, these symptoms

worsened when Monticello Flooring, in May of 2005, transferred her from the tallying position, where she was assigned for about one year, *see id.* at 2, ¶ 15,  to the nesting position.  In response, Plaintiff "continued to ask for accommodations, like going back to tallying, a commercial grade fan, a stool, and bathroom breaks as necessary."  *See id.* at 5, ¶ 60.  Monticello Flooring did not return Plaintiff to the tallying position but did ultimately provide her with a small fan at her nesting station.  Plaintiff's husband left Monticello Flooring shortly after Plaintiff's move to the nesting station.  *See* DE #28-3 (Larry Crabtree Affidavit) at 3-4, ¶¶ 41-42 (detailing the time-line and reasons for quitting).

Plaintiff worked in the nesting position for approximately one year, and her MS symptoms worsened.  *See id.* at 4, ¶¶ 47-48 (noting that his wife suffered from arm and leg pain, lost weight, and had difficulty sleeping prior to her medical leave).  Then, on June 13, 2006, Plaintiff, while traveling to work, briefly and inexplicably lost control of her vehicle, apparently as a result of an MS-related symptom(s).  Plaintiff reported to work, informed a supervisor of the incident, and made an immediate appointment with her local doctor.  After completing some blood work, Plaintiff's doctor instructed Mr. Crabtree to drive his wife to see her neurologist (Dr. Sidney Houff) in Lexington.  *See* DE #37 (Transcript of Deposition) (hereinafter "Tr. 1") at 48-50 (detailing the events occurring after Plaintiff's near-accident).

Dr. Houff ordered further tests and provided Plaintiff with a medical excuse informing Monticello Flooring that Plaintiff could not return to work prior to July 6, 2006.  *See* DE #37-1 (Exhibits) at Exhibit A.  Less than one month later, Dr. Houff issued another medical excuse, dated July 5, indicating that Plaintiff "may not return to work until further notice."  *See id.* at Exhibit B.  Plaintiff or Plaintiff's husband allegedly provided Monticello Flooring with both medical excuses.

*See* DE #28-2 (Reba Crabtree Affidavit) at 5, ¶¶ 64-65; DE #28-3 (Larry Crabtree Affidavit) at 4, ¶ 51; DE #37 (Tr. 1) at 32, 62.

Though admittedly covered by the FMLA, *see* DE #10 (Initial Answer) at 1, ¶ 5, Monticello Flooring terminated Plaintiff's employment and insurance coverage on August 1, 2006. *See* DE #38 (Tr. 2) at 28. Subsequently, an administrative law judge approved Plaintiff's application for Social Security Disability Insurance (SSDI) benefits, dating eligibility back to June 12, 2006. *See* DE #39-1 (Exhibit A - Notice of Decision). Plaintiff also sought relief under the ADA, FMLA, and Kentucky law, filing a complaint alleging distinct violations of each on May 16, 2008.

**II. Standard of Review**

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *See* FED. R. CIV. P. 56(c)(2). The Court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the Court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *See Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine issue of material fact initially rests with the moving party. *See Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'

5

which it believes demonstrate the absence of a genuine issue of material fact"); *Lindsay*, 578 at 414

("The party moving for summary judgment bears the initial burden of showing that there is no

material issue in dispute.").  If the moving party meets its burden, the burden then shifts to the

nonmoving party to produce "specific facts" showing a "genuine issue" for trial.  *See Celotex Corp.*,

106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999).  In cases, as here, where

the defendant is the moving party, "the plaintiff, to survive the defendant's motion, need only

present evidence from which a jury might return a verdict in his favor.  If he does so, there is a

genuine issue of fact that requires a trial." *See Anderson*, 106 S. Ct. at 2514.  However, "Rule 56(c)

mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial."  *See Celotex Corp.* at 106 S. Ct. at 2552.

A fact is "material" if the underlying substantive law identifies the fact as an essential

element.  *See Anderson*, 106 S. Ct. at 2510.  Thus, "[o]nly disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary judgment.

Factual disputes that are irrelevant or unnecessary will not be counted."  *See id.*  A "genuine" issue

exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for

that party."  *See id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record

taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

'genuine issue for trial.'") (citation omitted).

As a critical procedural matter, Defendants' motion fails to satisfy the initial burden under

Rule 56.  "If the moving party seeks summary judgment on an issue for which it does not bear the

burden of proof at trial . . . the moving party may meet its burden by showing 'that there is an

6

absence of evidence to support the nonmoving party's case.'" *See Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (quoting *Celotex*). To "show" the hole in the non-movant's case, the movant must discuss the record and provide more than general assertions critical of, *e.g.*, the opponent's complaint. Here, despite a two volume deposition of Plaintiff, Defendants quote none of the deposition testimony. Contending that Plaintiff has offered no proof, but then failing to discuss the myriad allegations and factual specifics to which Plaintiff did testify, does not comport with the Rule 56 mechanics. Further, the summary judgment memorandum essentially ignores the content of the lengthy affidavits from Plaintiff and her husband. The defense did not tender any counter-affidavits in the case.

The motion not only avoids discussion of the full record; it also nakedly asserts critical *contrary* facts with no record support. The examples of central factual statements that appear without support include: job summaries and job duties, *see* DE #34-1 (Memorandum in Support) at 1; descriptions of the tallying and rough lumber grading history, duties, and assignments, *see id.* at 2; conclusions about the fan dispute and the potential for reassignment to the tallying position, *see id.* at 12-14; discussion of reasonableness or availability of accommodations, *see id.*; and protestations about Johnnie Crabtree's motivations. *See id.* at 21. Simply put, the motion features no record basis for evaluating, much less accepting, any counter-factual assertions put forth in support of summary judgment.

Again, for procedural reasons, the Court finds that Defendants failed to meet the initial Rule 56 burden. In addition to that independent basis for denial, the Court turns to the merits as a final alternate decisional basis.

**III. Analysis**

A. *Americans with Disabilities Act*[1]

In her complaint, itself no model of clarity, Plaintiff appears to allege the following violations of the Americans with Disabilities Act (ADA): 1) discrimination, primarily by lack of reasonable accommodation, and 2) retaliation. *See* DE #3 (Complaint) at 4. Jury questions attend each theory on this record.

<u>Reasonable Accommodation</u>

The ADA prohibits "discriminat[ion] against a qualified individual with a disability because of the disability . . ." *See* 42 U.S.C. § 12112(a).[2] Such discrimination includes a failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship . . ." *See* 42 U.S.C. § 12112(b)(5)(A). In order to qualify for relief under this provision of the ADA, Plaintiff must prove, by a preponderance of the evidence, all of the following: 1) that she has a disability; 2) that she is otherwise qualified for the job; and 3) that Defendants refused to make reasonable accommodation for her disability. *See Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997).

Here, Plaintiff has provided sufficient evidence, at this stage, to allow a reasonable jury to

---

[1]

The ADA analysis also governs Plaintiff's claims under KRS § 344.280. *See Henderson v. Ardco, Inc.*, 247 F.3d 645, 649 (6th Cir. 2001) ("We interpret Kentucky protections for the disabled consonant with the federal Americans with Disabilities Act.") (citing *Brohm v. J H Properties, Inc.*, 149 F.3d 517, 520 (6th Cir. 1998)). In her complaint, Plaintiff asserts retaliation and conspiracy claims (related to ADA violations) in violation of Kentucky law. *See* DE #3 (Complaint) at 4-5.

[2]

This and all subsequent ADA citations refer to the version of the Act in effect in 2006.

return a verdict in her favor.  First, Plaintiff's deposition and affidavit, along with Larry Crabtree's

affidavit, provide sufficient evidence to find a genuine issue as to her disability.  Under the ADA,

an individual with a disability suffers from "a physical or mental impairment that substantially limits

one or more of the major life activities of such individual."  *See* 42 U.S.C. § 12102(2)(A).  Major

life activities include "functions such as caring for oneself, performing manual tasks, walking,

seeing, hearing, speaking, breathing, learning, and working."  *See* 29 C.F.R. § 1630.2(i) (2006);

*Wysong v. Dow Chem. Co.*, 503 F.3d 441, 450 (6th Cir. 2007) (quoting this language but noting that

"this list in not meant to be exclusive"); *see also Toyota Motor Mfg., Ky., Inc. v. Williams*, 122 S.

Ct. 681, 691 (2002) (defining major life activities as "activities that are of central importance to most

people's daily lives"); *Sutton v. United Air Lines, Inc.*, 119 S. Ct. 2139, 2147 (1999) ("[W]hether

a person has a disability under the ADA is an individualized inquiry."); *Bragdon v. Abbott*, 118 S.

Ct. 2196, 2205 (1998) (refusing to "confin[e] major life activities to those with a public, economic,

or daily aspect"); *Penny v. United Parcel Service*, 128 F.3d 408, (6th Cir. 1997) (noting that other

major life activities include "sitting, standing, lifting, [and] reaching") (citation omitted).[3]

The record shows that Plaintiff has been diagnosed with Remitting/Relapsing Multiple

Sclerosis, which, at a minimum, significantly affected her appetite, her ability to stand for long

periods of time, and her bladder function.  *See* DE #28-3 (Larry Crabtree Affidavit) at 4, ¶¶ 47-48

("The lifting required caused her pain in her arms and legs, and she began to lose weight because

of her anxiety over her treatment at work.  She was under one hundred pounds before being put on

---

[3]

The Court notes that subsequent amendments to the ADA, which became effective on
January 1, 2009, supersede parts and/or holdings of the cited cases.  However, the amended language
does not apply to Plaintiff's claims as they arose out of conduct occurring several years prior to
enactment.

sick leave, and her anxiety also made it difficult for her to sleep at night."); DE #37 (Tr. 1) at 127-28 (bladder and kidney issues); DE #38 (Tr. 2) at 80-82 (referencing increased issues with bladder and kidney function after moving from tallying to nesting); DE #28-1 (Response I) at 12 (discussing generally Plaintiff's limited major life activities). Crabtree specifically testified that during the period at issue: 1) she intermittently experienced limpness in her arms and legs, *see* DE #37 (Tr. 1) at 82; DE #38 (Tr. 2) at 116; 2) her bladder problems included both urgency and difficulty voiding, which caused more and longer bathroom trips, *see* DE #37 (Tr. 1) at 116; DE #38 (Tr. 2) at 82; and 3) she was susceptible to difficulty because of heat. *See* DE #38 (Tr. 2) at 107. She also testified to the mental affects from MS. *See id.* at 95, 131. The auto incident precipitating leave reflects loss of muscle control and memory. *See id.* at 26 (discussing tests related to "right arm and right leg. My gripping"); *id.* ("Sometimes I can't hold stuff and then my right leg gives out."). Notably, she has not driven since that 2006 incident, per the orders of her physician. *See id.* at 41.

Thus, Plaintiff has put forth sufficient evidence by which a jury could find that she is a person with a disability. The defense concedes that it was aware of Plaintiff's MS diagnosis. *See* DE #10 (Answer) at 1, ¶ 5. Defendants further admit that work transfers of Plaintiff "made reasonable accommodations for any disability which may have affected the Plaintiff so far as possible without imposing undue hardship on the Defendants." *See id.* at 2, ¶ 7. These positions strongly indicate that, at a minimum, Monticello Flooring "regarded" Crabtree as having a disability. This buttresses the Court's finding on summary judgment. *See* 42 U.S.C. § 12102(2)(C) (defining "disability" to include an individual "being regarded as having such an impairment" as specified in 42 U.S.C. § 12102(2)(A)). Monticello Flooring did not reply to this (or any) argument raised in Plaintiff's briefing.

Second, evidence also exists to support a jury finding that Ms. Crabtree is otherwise qualified.  Under the ADA, a qualified individual is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  *See* 42 U.S.C. § 12111(8).  Here, the record reflects that Plaintiff performed a number of jobs at Monticello Flooring, including working as a tally marker, which provided Plaintiff with a majority of requested accommodations, and nesting, a job Plaintiff performed for a year without (in Crabtree's estimation) accommodation.  Thus, following her MS diagnosis, Plaintiff was a qualified individual at Monticello Flooring.  Particularly as to the sought tallying position, Plaintiff  meets this element.

Defendants' reliance on Plaintiff's Social Security Disability Insurance (SSDI) application as effectively nullifying Plaintiff's proof (and thus entitling Defendants to summary judgment) is misplaced.  The Supreme Court, in *Cleveland v. Policy Mgmt. Sys. Corp.*, 119 S. Ct. 1597 (1999), refused to limit substantially the number of persons who could simultaneously receive SSDI benefits and ADA relief.  *See id.* at 1603.  Instead, the Supreme Court held that

> When faced with a plaintiff's previous sworn statement asserting "total disability" or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim.  To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" of her job, with or without "reasonable accommodation."

*See id.* at 1604.  As directed by the Court's response order (DE #36), Plaintiff addressed the discrepancy by specific facts regarding her employment history with Monticello Flooring, the availability of reasonable accommodations, and Plaintiff's interrupted medical treatment.  *See* DE #39 (Response II) at 2-3.  In short, Plaintiff has put forth sufficient evidence for a jury to find that

11

she is a qualified individual under ADA despite her qualification for SSDI benefits.

Finally, Plaintiff has offered sufficient proof of reasonable accommodations that Monticello Flooring withheld.  A dispute exists as the timing and reason for Larry Crabtree's resignation, which impacts the requested accommodation, namely job transfer.  *Compare* DE #34-1 (Memorandum in Support) at 14 ("Generally, the grading and tallying positions involve two workers who switch off between the two jobs.  Because Crabtree's husband was willing to do only the grading work, Monticello Flooring allowed the requested arrangement.  Her husband [Larry Crabtree] left Monticello Flooring and shortly after Crabtree was moved to the nesting job, because the tallying position was no longer available to Crabtree.") *with* DE #28-3 (Larry Crabtree Affidavit) at 2, ¶¶19-21 ("In 2005, Reba was moved back into the mill to train flooring graders.  The move was supposed to be temporary so that Reba could train other people.  After about a month, I asked for Reba to be moved back [to] my post because I was overwhelmed doing the work of two people and the work in the mill was very hard on Reba.") and DE # 28-2 (Reba Crabtree Affidavit) at 4, ¶¶ 32-35, 51 (averring that her husband quit over the issue of Plaintiff's treatment after she was reassigned from the tallying job to the nesting job).

The defense concedes that the tally/rough grader allocation worked for a time.  Plaintiff contends Monticello Flooring ostensibly moved her back into the mill "temporarily" to train other workers.  However, she avers that she did not actually train workers, and the relocation was permanent.  *See* DE #38 (Tr. 2) at 88.  The chronology matters, and factual questions exist over how and when Monticello Flooring ultimately allocated the rough grading/tallying duties and whether the team approach used between Larry and Reba Crabtree could reasonably have continued.

The fan accommodation also presents a triable issue.  Crabtree specifically contends that she

12

sought a fan and communicated to Monticello Flooring that she needed a fan because of the MS and her vulnerability to heat. *See id.* at 107. Reasonable minds may differ over the fan quality, but denial of the sought fan, along with the vandalism to Crabtree's prior fan, creates an issue on the failure to provide suitable cooling to Plaintiff.

Defendants arguments to the contrary are wholly unpersuasive. In constructing their motion for summary judgment, Defendants relied almost entirely on Plaintiff's complaint while choosing to ignore the two-volume transcript of Plaintiff's deposition. As described above, the deposition, along with affidavits from Plaintiff and her husband, raise genuine issues as to her status as a qualified individual with a disability. More significantly, Defendants emphasis on the *reasonableness* of their purported accommodation actually undercuts any basis for summary judgment.

<u>Retaliation</u>

The ADA also protects against employer retaliation. *See* 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."). To prevail on a retaliation claim under the ADA, Plaintiff must prove, by a preponderance of the evidence, the following elements: 1) that she was engaged in protected activity; 2) that Defendants had knowledge of her engagement; 3) that Defendants, after gaining such knowledge, undertook an adverse employment action; and 4) that a causal link exists between the protected activity and the adverse employment action. *See, e.g., Kuriatnyk v. Township of Bazetta, Ohio*, 93 F. App'x. 683, 686 (6th Cir. 2004) (citing *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990).

13

Plaintiff claims that Defendants, in violation of the ADA and Kentucky statute, retaliated against her as a result of her request for reasonable accommodations. *See* DE #3 (Complaint) at 4-5. As previously noted, Plaintiff identified and pursued specific reasonable accommodations as provided for by the ADA; thus, a reasonable jury could find that Plaintiff was engaged in protected activity. *See Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 191 (3d Cir. 2003) ("The right to request an accommodation in good faith is no less a guarantee under the ADA than the right to file a complaint with the EEOC . . ."); *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12 (1st Cir. 1997) (assuming *arguendo* that an accommodation request is protected activity because "[i]t would seem anomalous . . . to think that Congress intended no retaliation protection for employees who request a reasonable accommodation unless they also file a formal charge"); *Garcia v. Third Federal Sav. and Loan Ass'n of Cleveland*, No. 1:06-cv-1990, 2007 WL 1235820, at *6 (N.D. Ohio Apr. 26, 2007) (unpublished) (noting that the Sixth Circuit has not yet answered "whether requesting reasonable accommodations constitutes protected activity for purposes of a retaliation claim"); *id.* (collecting cases from six other circuits that recognize such requests as protected activity and concluding "[b]ased on this heavily persuasive authority, . . . that requesting a reasonable accommodation is protected activity for purposes of a retaliation claim").

Additionally, the record shows sufficient evidence of Defendants' notice. In fact, Defendants do not seem to contest the knowledge requirement. *See* DE #34-1 (Memorandum in Support) at 22-24 (discussing retaliation claim). Monticello Flooring concedes that it knew of Crabtree's MS diagnosis, and it contends efforts to reasonably accommodate her. *See* DE #10 (Answer) at 1-2, ¶ 5; *id.* at 2, ¶ 7.

A genuine issue also exists as to the third element. In order to constitute an adverse

employment action, such action must be a "materially adverse change in the terms of or conditions of . . . employment because of [the] employer's conduct." *See Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1107 (6th Cir. 2008) (citations omitted). Relatedly, to qualify as "materially adverse," the change in employment conditions "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *See Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004) (citations omitted). Here, the record shows that, in early summer 2005, Defendants curiously transferred Plaintiff from tallying to nesting. Even though Plaintiff does not allege that the job change resulted in decreased pay, she demonstrates that the change in conditions was more than "a mere inconvenience." Specifically, Plaintiff references such changes as the inability to control the temperature of her new environment, difficulty in the required bending and lifting motions, exacerbation of bladder issues, and fatigue and other physical symptoms due to standing as she worked. *See* DE #28-2 (Reba Crabtree Affidavit) at 4, ¶ 41 ("Because of MS, I am extremely sensitive to heat and I am no[t] supposed to get hot."); *id.* at 4-5, ¶¶ 55-60 ("The stress at work and nesting made my MS flare-up. My muscles ached so much that I was in extreme pain. I did not have any energy and I was very fatigued. My bladder and kidney problems became worse. I became very depressed. I continued to ask for accommodations, like going back to tallying, a commercial grade fan, a stool, and bathroom breaks as necessary."). Based on this evidence, a reasonable jury could find that Plaintiff suffered an adverse employment action. Additionally, of course, Plaintiff contends ultimately that the transfer rendered her unable to work at all in the nesting position and ended her employment altogether.

Crabtree also identified particular retaliatory events, including destruction of the family fan, harassment related to bathroom trips, and comments from Johnnie Crabtree. The jury must

15

determine whether these events happened, but if they did, a jury could find the conduct in toto actionable under state and federal law. *See Burlington Northern & Santa Fe Railway Co. v. White*, 126 S. Ct. 2405, (2006) (holding that a plaintiff, to succeed in prosecuting a retaliation claim, "must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination'") (citations omitted).

The causation question is a close one, at this stage. Significant questions do exist about Johnnie Crabtree's animus and role in the treatment of Plaintiff. Plaintiff directly testified to Crabtree's hostility over bathroom breaks, *see* DE #37 (Tr. 1) at 117; *id.* at 128-29, medications, *see id.* at 132; DE #38 (Tr. 2) at 85, and her medical condition. *See id.* at 87. Plaintiff raised questions about why and when the transfer to nesting occurred. Notably, Monticello Flooring told her the transfer was for training and was temporary, neither of which was accurate. Based on these questions, and the dispute over the reason for and timing of Larry Crabtree's departure, the Court believes that a jury question exists over whether Defendants acted against Plaintiff because of her disability status and accommodation requests.

B. *Family and Medical Leave Act*

In addition to claims under the ADA and Kentucky statute, Plaintiff also alleges that Defendants violated her rights under the Family and Medical Leave Act (FMLA). *See* DE #3 (Complaint) at 4. Specifically, she charges Defendant Monticello Flooring with failing to provide information and notice about FMLA-related rights and with terminating her employment and benefits in violation of the Act. *See id.* Defendants seek summary judgment on this claim. *See* DE #34-1 (Memorandum in Support). Based on the record, the Court finds that summary judgment

16

plainly is not proper as to Plaintiff's FMLA claims.

Under the FMLA, "an eligible employee [is] entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." *See* 29 U.S.C. § 2612(a)(1)(D).[4] An employee is considered eligible if he or she has been employed "for at least 12 months by the employer with respect to whom leave is requested . . ." *See id.* § 2611(2)(A)(i).  The Act defines a serious health condition as "an illness, injury, impairment, or physical or mental condition that involves . . . continuing treatment by a health care provider." *See id.* § 2611(11)(B).

During a period of leave, an employer may not discontinue "any employment benefit accrued prior to the date on which the leave commenced." *See id.* §2614(a)(2).  Such benefits include the continuance of "coverage under any 'group health plan' . . . for the duration of such leave at the level and under the conditions coverage would have been provided if the employee had continued in employment continuously for the duration of such leave." *See id.* § 2614(c)(1).  An eligible employee is also entitled to be restored to his or her original position or an equivalent position upon return from leave. *See id.* § 2614(a)(1)(A)-(B).

The FMLA prohibits an employer from interfering with an eligible employee's exercise of rights under the Act. *See id.* § 2615(a)(1).  To prevail, a plaintiff bringing an interference claim must prove: 1) that she is an eligible employee; 2) that the defendant is an employer covered by FMLA; 3) that she is entitled to leave under the Act; 4) that she provided the employer with notice of intent to take leave; and 5) that the employer denied her entitled benefits under FMLA. *See Anderson v. Avon Prod., Inc.*, 340 F. App'x 284, 287 (6th Cir. 2009); *Killian v. Yorozu Auto. Tenn.,*

---

[4]

This and all subsequent FMLA citations refer to the version of the Act in effect in 2006.

17

*Inc.*, 454 F.3d 549, 556 (6th Cir. 2006).

Here, a jury must evaluate the FMLA claims presented. The parties do not contest whether Plaintiff is an eligible employee and Defendant Monticello Flooring is an employer under FMLA. As for the third element, Plaintiff has provided sufficient facts to allow a jury to find that she was entitled to FMLA leave. As previously noted, Plaintiff was diagnosed with Remitting/Relapsing Multiple Sclerosis in 2002. Due to this illness, Plaintiff suffers from a number of physical ailments and was, at the time of requested leave, under the continued care and treatment of Dr. Sidney Houff. Dr. Houff explicitly placed Plaintiff on medical leave in June 2006. As detailed by her deposition testimony, Plaintiff has received and continues to take several prescription medications to address her MS symptoms. *See* DE #38 (Tr. 2) at 102 (listing Copaxone and Rebif as two MS-related medications); *id.* at 103-05 (listing other medications). Thus, sufficient evidence exists to show a genuine issue as to Plaintiff's entitlement to leave.

A genuine issue also exists as to leave notice; in fact, Defendant admits as much. *See* DE #34-1 (Memorandum in Support) at 9 n.1. The record includes, as an exhibit to Plaintiff's deposition transcript, copies of three doctor's slips indicating a medical necessity for Plaintiff's leave. *See* DE #37 (Tr. 1) at Exhibit C. Additionally, the affidavits of both Plaintiff and Plaintiff's husband aver that one or the other notified Monticello Flooring of Plaintiff's need for medical leave by delivering leave slips. *See* DE #28-2 (Reba Crabtree Affidavit) at 5, ¶¶ 64-65 ("On June 13, 2006, I provided Monticello Flooring with notice from my doctor. On July 5, 2006, my doctor gave me another note and Larry took it to the office for me."); DE #28-3 (Larry Crabtree Affidavit) at 4, ¶ 51 ("On July 5, 2006, Reba's doctor gave her a further notice of sick leave and I took the note in for further notice of sick leave and I gave it to Richard West in the office."). Thus, specific facts

18

exist to allow a reasonable jury to find that Plaintiff met the notice requirement under FMLA.

Finally, Plaintiff has provided sufficient evidence that Monticello Flooring unlawfully denied her benefits and employment under FMLA.  In her affidavit, Plaintiff avers, "On August 8, 2006, I found out that Monticello Flooring fired me and cancelled my insurance."  *See* DE #28-2 (Reba Crabtree Affidavit) at 5, ¶ 66; *see also* DE #37 (Tr. 1) at 44-45 ("Q. And so why did you end up contacting them [Monticello Flooring]? A. To see why they canceled my insurance cause we paid for our insurance. Q. How did you know that they canceled your insurance? A. Cause they said I was terminated – Q. How did – A. – and I tried using my insurance.  Q – they tell you that?  How did they communicate that to you?  How did - how did you find out that your insurance was canceled? A. Well, I went in to talk to Jeannette and when I went in she said that it - it was canceled because I was terminated.").  Because Plaintiff's medical leave began in mid-June of 2006, Defendant Monticello Flooring's termination of the employment relationship fell considerably short of the required 12-week period.[5]  Additionally, even though both parties indicate that Monticello Flooring apparently paid Plaintiff's COBRA premiums through December 2006, *see* DE #34-1 (Memorandum in Support) at 26 (citing Plaintiff's Memorandum of Law in Support of Her Response to Defendant's Motion for Summary Judgment or Discovery Sanctions), a question of fact also exists as to whether Monticello Flooring violated the benefits provision of FMLA by the early termination of group coverage.  COBRA continuation is not an automatic equivalent to pre-cancellation coverage.

In short, a genuine issue exists as to all five elements Plaintiff must prove to prevail on the

---

[5]

Plaintiff did not seek to return during the time of leave, but Monticello Flooring did not tell Plaintiff she was about to be terminated.  If Monticello Flooring had extended the required leave, Plaintiff may have attempted to return with an accommodation.  This is for the jury.

FMLA claims presented.

**V. Conclusion**

For the reasons discussed, the Court DENIES the motion for leave, DE #33, and DENIES alternatively the motion for summary judgment, DE #34.[6]

This the 15th day of March, 2010.

Signed By:

*Robert E. Wier*

United States Magistrate Judge

---

[6]

At the pretrial conference, the Court stated areas of doubt about Plaintiff's ultimate case. These concerns include 1) questions over the FMLA remedy based on the fact that documented inability to work exceeded the statutory leave period; 2) questions over the testimonial inconsistencies shown in Plaintiff's deposition; 3) the effect of the Social Security claim; 4) questions over Johnnie Crabtree's true motivation (*i.e.*, personal or disability related); 5) the lack of expert proof; and 6) questions over whether the ADA provisions in effect in 2006, rather than now, would weaken Plaintiff's eligibility for disability status under the law. The parties must be prepared to address these matters in full at the Rule 50 stage and otherwise during trial.